Nicholson, C. J.,
delivered the opinion of the Court.
In December, 1862, Lucy Johnson and others filed their bill in the County Court at Fayetteville, against the other heirs and distributees of Agnes Johnson, deceased, for the purpose of procuring the sale of a number of slaves, which had belonged to Agnes Johnson, deceased. The object of the sale was, that the proceeds might be partitioned amongst the distributees. A decree of sale was made, by which the Clerk and Master was ordered to sell the slaves on a credit of twelve months, *524 taking notes, with security, for all the purchase money, except five per cent, on the amount, and retaining a lien for the purchase money. The slaves were sold, and John A. Johnson, C. M. Johnson and Moses Cruse, three of the distributees,' purchased four of the slaves at the price of $3,580, paying $179 in cash, and giving their notes, with A. II. Eddy and S. S. Alexander as securities. The Clerk and Master made out a report of the sale, and returned it to the June Term, 1863, of the County Court,[1] but the minutes of that term of the Court were never signed by the Court, and' hence the report of sale was never confirmed.
Some time after the sále, John A. Johnson, with the knowledge and consent of C. M. Johnson, took the slaves South, where they were kept until after the close of the war, when they were brought back to Tennessee. In the meantime, they had been emancipated by the act of the Government.
The bill in this cause was filed by the purchasers of the slaves, together with their securities, against the other distributees of Agnes Johnson, deceased, setting forth the foregoing facts, and alleging that as the sale was never confirmed by the Court, the purchasers got no title, and praying that the notes for the purchase money be delivered up and canceled.
The defendants answer, and admit most of the allegations in the bill, but insist that if complainants got no title to the slaves, yet they ought to be responsible, for the reason that they carried the slaves to the South, and thereby made themselves liable for á conversion. It is *525 neither stated in tbe answer, nor proven, that the slaves were delivered to complainants when they executed their notes for them; nor is it insisted in the answer that the title was vested in the purchasers by virtue of the sale b;y the Clerk and Master, but it is insisted that if the title did not pass, complainants are liable for a conversion of the slaves.
The only proof in the cause is found in the following agreed facts: “That John A. Johnson, with others, became the purchasers of the negroes mentioned in this cause, and that about the last of July, 1863, when Bragg’s forces were leaving the State of Tennessee, and the Fed-eráis advancing, John A. Johnson, of his own will, and by the consent and advice of C. M. Johnson, one of the joint purchasers of said negroes, removed them from the State of Tennessee to the State of Alabama, and that in 1865, after the surrender and the close of the war, said negroes were brought back to Tennessee by said John A. Johnson.” It was further agreed, that John A. Johnson was administrator of Agnes Johnson.
The question to be decided upon these facts, and upon the allegations in the bill, and the statements in the answer, is, upon whom does the loss of the slaves fall— upon the three distributees, who were purchasers at the Master’s sale, or upon all the distributees?
If has been uniformly determined that the loss, in such a case as this, must fall upon those who were the owners of the property at the time the loss occurred. In this case, the loss occurred when negroes ceased to be property, by virtue of the act of the Government of the State in February, 1865. We aré to inquire, there *526 fore, in whom was the legal title to the slaves in February, 1865?
It is well settled, that, since the Act of 1827, c. 61, and the Code, 2246, the title to slaves vested directly in the distributees of an intestate, or the legatees of a testator, and not in the administrator or executor, as it did prior to that Act. The personal representative, however, held the slaves, subject to be made liable for the debts of the intestate or testator, according to the provisions of that Act, and the Code. 1 Sneed, 365; 2 Sneed, 468; 3 Head, 698.
The proper proceedings were had,'under the Act of 1827, and the Code, 2246, for the sale of the negroes of Agnes Johnson, deceased, for the purposes of distribution. When the sale took place, under these proceedings, the title to the slaves was in the distributees of Agnes Johnson, deceased, and the question is, was the title divested out of them, and vested in the purchasers, by operation of law, upon their bidding the negroes off, and executing their notes, with security, without anything more? Or did the title remain in the distributees until the bid of the purchasers should be accepted, and their notes for the purchase money approved by the Court, and the sale confirmed?
The decisions in our State have been uniform, that, as to the sale of lands by Clerks and Masters, the title remains in the original owners thereof until the sale is confirmed, and then the title is divested out of them, and is vested in the purchasers. Childress v. Hurt, 2 Swan, 487. It is difficult to see why the same rule should not prevail in the case of judiciál sales of slaves, since the *527 decisions construing the Act of 1827; yet it is well known that the cases to be found in our books, present, on this question, no such uniformity of adjudication.
In the case of Shaw v. Smith, 9 Yer., 97, it was held, in relation to rights acquired under a Sheriff’s sale, “that the contract was complete so soon as the negroes were struck off to the plaintiff as the highest bidder. He thereby acquired from the Sheriff all the property in the negroes, which had existed in the defendant in the execution at the time of the levy, and in consideration thereof he was bound to pay the price he had bid.” This case did not involve the question as to where the legal title to slaves was after the death of their owner. It was an execution levied upon slaves of a defendant who . was living, and the only question was, whether the title passed when the hammer fell, without an actual delivery. It was properly held, that the contract was complete so soon as the slaves were bid off, and that the purchaser was responsible for the price bid.
In the case of Potter v. Coward, Meigs’ Hep., 22, it was held that a sale of chattels was complete so soon as both parties have agreed to the terms. In that case, an administrator was ordered by the County Court to sell sundry negroes for cash in hand. Defendant was the highest bidder for four of the slaves. One, named Lewis, was bid off at $680. The bidding was not completed till late in the evening, and about sundown the administrator said, in the hearing of the defendant, that it was then too late to proceed with the business, but that the purchasers must attend next morning, and finish or close it. None of the negroes bid off by defendant were proven to have *528 been delivered to him on the day of sale, nor did he pay any of the purchase money on that day. The defendant assented to the administrator’s proposition, to attend next morning and finish the business. During the night the slave, Lewis, died suddenly. Defendant attended next morning, paid for the other negroes, but refused to pay for Lewis, on account of his having died before payment and delivery. Upon these facts the Court held that it is not the delivery or tender of the property, nor the payment of the purchase money, which constitutes a sale. The sale is good and complete so soon as both parties have agreed to the terms. It being the contract of sale, then, which changes the right to the possession, it necessarily follows that the right to the possession is changed from' the moment the contract is made, and that the loss after that period of time is the loss of the vendee. It was assumed in this cause, both in the argument of counsel and in the opinion of the Court, that the legal title to the slaves, after the death of the intestate, was in the administrator, and the County Court ordered him to sell them for cash, but nothing is said about his making report to the Court. But the opinion proceeds upon the ground that the administrator had the right to make the contract, and as soon as the contract was made, the title, and consequently the right of possession, passed to the purchaser; and hence the Court, in that case, refer to the case of Shaw v. Smith, 9 Yer., 97, as a conclusive authority.
It is manifest that the facts in neither of these cases raised the question as to where the legal title to slaves was after a sale on credit by the Master, who had taken *529 the purchaser’s notes, retaining a lien, and whose sale was to be reported to the Court for confirmation. Upon the assumption that in the one case .the title was in the administrator, and in the other in the Sheriff, the correctness of the decisions can not be questioned.
In the case of Newman v. Sloan, 5 Cold., 390, the facts are stated so briefly, that it is’ difficult to see how the question is raised as to the risk of the slave between the sale of the Master and the confirmation thereof by the Court. It is said in that case by the Court: “We are aware of no case involving the sale of personal estate, in which it has been directly and authoritatively decided that the casualties which may befall the property, between the sale and confirmation, must be borne by the original owners, and not the purchaser. Potter v. Coward, Meigs’ Rep., 22, is an authority directly to the contrary of this, and shows that this slave, after the Master’s sale, was at the risk of Boyd, the purchaser.” There is nothing in the report of this case which enables us to see for what purpose the negro was sold by the Master,' or whether he was sold as the property of an intestate or testator for distribution, or for the payment of debts, or whether the title was in a living defendant, or in the distributees or legatees of an intestate or testator. We can not, therefore, see that the case is an authority, applicable to the cause before us, any more than the case of Potter v. Coward, on which it rests.
In the case of Polk v. Pledge, 5 Cold., 384, the facts were, in all respects, like those in the case before us, except that in Polk v. Pledge, it appears that the slaves .were delivered to the purchaser when he executed his *530 notes. In giving his opinion, Judge Milligan says: “The sale, it is true, is not complete until the report is confirmed, nor can the purchaser be compelled, before confirmation, to complete his purchase; and, viee versa, he can not compel its completion by a conveyance until after confirmation.” Childress v. Hurt, 2 Swan, 487.
This statement of the law is fully sustained by the case of Childress v. Hurt, in which Judge McKinney says, in regard to sales by a Master: “The purchaser is not considered as entitled to the benefit of his purchase till the Master’s report of the purchaser’s bidding is absolutely confirmed- by the Court. Until confirmation of the report, the contract is not regarded as complete or binding.”
The legitimate and necessary conclusion, from the position laid down by Judge Milligan, and sustained by Judge McKinney, would seem to be, that, if the slaves were emancipated before the title to them became complete by confirmation thereof, the loss would fall on the original owners, in whom the title continued. But Judge Milligan avoids this necessary conclusion by stating that “the purchasers had complied with the terms of the sale by executing their notes, and elected at the date of the sale to receive the slaves purchased by them; and they have continued to hold and use them as their own, as we infer from the record, from the date of the sale, in 1861, until they were emancipated, in February, 1865. The risk was voluntarily assumed by them.”
It may be conceded that the purchasers might make themselves liable for a conversion, by electing to take the negroes and hold them as their own, without waiting for *531 tbe completion of their title by a confirmation by the Court; but the securities would clearly be released, unless it appeared that they had assented to the election made by the purchasers. But we can not concur in Judge Mil-ligan’s conclusion, that the title depended on the question of delivery or no delivery.
But, in the case under consideration, it does not appear that when the purchasers executed their notes, with security, the negroes were delivered to them, if this was a material question; nor that they elected to hold them as their own, and to take the risk of a confirmation of the sale by the Court; nor that their securities were cog-, nizant of or sanctioned any such election by the purchasers. In this material respect, the case before us is distinguishable from the case of Polk v. Pledge, as well as the cases of Potter v. Coward, and Newman v. Sloan, on which Judge Milligan relies in his opinion in the first named case. It is similar, in all its material facts, with the case of Graves v. Keaton, 3 Cold., 8, in which Judge Hawkins held that “the pecuniary loss consequent upon ‘the emancipation of slaves, by the amendment of the Constitution of the State, adopted on the 22nd of February, 1865, must be borne by those who were the owners of such slaves at the time of their emancipation. Until the sale is completed by the confirmation of the report of sale by the Court, the purchaser acquires no title to the property.”
But it is insisted for defendants that, although the title to the slaves did not pass to the purchasers, yet that two of the complainants, John A. Johnson and C. M. Johnson, took the slaves South, kept them there until *532 1865, and thereby made themselves liable for a conversion. The facts fail to sustain this position. It is in proof that John A. Johnson, one of. the purchasers of the slaves, was the administrator of Agnes Johnson, deceased, and as such, would reasonably have possession of the slaves. It appears that when Bragg was falling back, and the Fed-eráis were advancing, in July, 1863, the administrator, with the consent of C. M. Johnson, who, as well as the administrator, was a distributee of Agnes Johnson, removed the slaves from Lincoln County into A labama, but whether for the purpose of saving the property for the estate, or under a claim of ownership, does not appear from the proof. We can not assume that he was guilty of a conversion, but rather that he was discharging his duty as an administrator, or exercising his right as a tenant in common, in trying to save the property. It is scarcely necessary to add that if the administrator and C. M. Johnson were guilty of a conversion, the liability would attach only to them and not to Cruse, the other purchaser, nor to Eddey and Alexander, who are not shown to have concurred in or assented to the removal of the slaves.
But, as the proof fails to show a conversion, it is unnecessary to notice this point further.
Upon a view of the whole case, we are satisfied that the title to the slaves continued in the distributees of Agnes Johnson, deceased, after the sale by the Master; and as the sale was not confirmed by the Court before they were emancipated, the loss must fall upon the dis-tributees, in whom was the ownership at the time of their emancipation; but as John A. Johnson, with the consent of C. M. Johnson, had possession of the slaves till their *533 emancipation, they are responsible for reasonable hire therefor.
The decree of the Chancellor giving judgment against the purchasers will be reversed, and the decree discharging the securities will be affirmed. 'The costs will be paid by the complainant's and defendants, in equal portions, and the cause will be remanded that an account of hire may be taken.